899 So.2d 711 (2005)
STATE of Louisiana
v.
Toby L. MATEN.
No. 2004 KA 1718.
Court of Appeal of Louisiana, First Circuit.
March 24, 2005.
Rehearing Denied May 11, 2005.
*714 Hon. Doug Moreau, District Attorney, Brent Stockstill, Dylan Alge, Assistant District Attorneys, Baton Rouge, for State of Louisiana.
Katherine M. Franks, Baton Rouge, for Defendant-Appellant Toby Maten.
Before: CARTER, C.J., PETTIGREW, and McDONALD, JJ.
PETTIGREW, J.
The defendant, Toby L. Maten, was charged by bill of information on October 24, 2000, with three counts of attempted first degree murder in violation of La. R.S. 14:30 A(3) and 14:27. On November 2, 2000, the defendant was appointed counsel and, after waiving formal arraignment, pled not guilty to each count. The defendant filed a motion to suppress a confession he made to the arresting officer and a motion to quash the indictment based on a speedy trial violation. The trial court denied both motions. The defendant also filed a pro se motion for recusation of Judge Erwin. There is no indication in the record that the motion was considered.
Jury selection was set to begin on May 27, 2003, when the defendant expressed to the court that he did not want to proceed with his current counsel. Both counsel indicated the defendant had tried to hurt his own case by attempting to withdraw his motion to suppress a confession despite the fact that this court had sided with him on the matter ordering the trial court to allow certain questioning.[1] Defense counsel informed the court the defendant was attempting to use him as a "mouth-piece" by having defense counsel say what the defendant wanted him to say. The defendant expressed dissatisfaction with his attorney and insisted that he would not sit next to him at trial. The defendant told the court he was not "dressing out," that it was in his best interest to be left "in the tank," and that if he had to sit next to his *715 lawyer, he did not know "what's liable to happen." Despite being advised several times that he should be present in court at his own trial, the defendant chose to be tried in absentia.
On May 29, 2003, the same day the trial commenced, a jury found the defendant guilty as charged of two counts (I and III) of attempted first degree murder. The prosecution dismissed count II of the bill because one of the State's witnesses failed to appear. Defense counsel gave notice of his intent to move for a "J.N.O.V. and a motion for new trial." However, no such motions were filed before sentence.
On January 22, 2004, the defendant stipulated to being a second felony habitual offender as to count I of the bill, and the trial court adjudged the defendant a second felony offender. On March 22, 2004, the trial court sentenced the defendant to serve a term of twenty-five years imprisonment at hard labor without the benefit of parole, probation, or suspension on each count, with the sentences to run concurrent. The defendant now appeals, asserting four assignments of error. For the reasons that follow, we affirm the convictions and sentences.

FACTS
On September 1, 2000, the defendant and an unidentified white male went to Angie Scott's trailer in Baker to pick up a work check from James Coleman, Angie's boyfriend. The defendant approached James and Angie outside the trailer, and James gave the check to the defendant. After getting his check, the defendant walked next door to the trailer of Aldrema Scott, his ex-girlfriend and Angie Scott's sister. Aldrema and the defendant had lived together for three years. Two weeks prior to September 1, 2000, Aldrema had asked the defendant to move out of the trailer. According to Aldrema, the defendant had beaten her up on occasions. According to the defendant's oral statement offered into evidence, he believed Aldrema was cheating on him. Aldrema denied the claim.
The defendant went to Aldrema's front door and tried to talk to her, but she told him to leave and that she was going to call the police. According to the record, the defendant's son was living with Aldrema and going to school. The defendant had called previously and told her to bring his son home. Aldrema told the defendant she would not take him out of school, but was going to let him finish the week. Aldrema indicated that prior to coming to her trailer on the day in question, the defendant had called her and told her he was going to kill her. Aldrema closed the door and went to the bathroom. When she came out of the bathroom, the defendant was waiting for her in the kitchen with a gun in his hand. When the defendant extended his check to Aldrema, she told him that he needed it. The defendant then shot Aldrema in the leg. As she ran for the back door, the defendant shot her two more times in the chest. Aldrema made it outside and managed to crawl underneath the trailer to hide.
The defendant left Aldrema's trailer and came face to face with Angie Scott, who was coming toward Aldrema's trailer after having heard the gunshots. The defendant shot Angie twice in the stomach. At that time, James came running around the corner and was shot in the arm. The defendant left the scene.
Richaldo Smith, Aldrema's neighbor, was in his yard when he heard the gunshots. Prior to the shooting, Mr. Smith had seen the defendant talking to Aldrema at her front door. After Aldrema was shot, Mr. Smith took her from underneath the trailer and placed her on her sofa until the paramedics arrived. All three shooting *716 victims were taken to the hospital and treated for their injuries.
On September 11, 2000, Officer Hilton Riley, Jr. of the Baton Rouge Police Department arrested the defendant and advised him of his rights. Officer Riley was undergoing training as a police officer when the arrest was made. He had received an anonymous tip of the defendant's whereabouts. Prior to the arrest, a warrant had been issued for the defendant's arrest of which Officer Riley was not aware. Officer Riley knew the defendant as they had grown up together. The defendant waived his rights orally and through a written waiver of rights form that he signed. After Officer Riley read the defendant his rights, and the defendant said he understood his rights, he told Officer Riley that on the day of the shooting, he had been drinking and had taken some drugs, that his girlfriend had been cheating on him, and that when he went to her house, he shot her at point-blank range. The defendant's confession was admitted at trial. At trial, Richaldo Smith positively identified the defendant as the only person around at the time of the shootings, and Aldrema and Angie Scott positively identified the defendant as the person who shot them at close range and without provocation.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment of error, the defendant avers the evidence was legally insufficient to support a verdict of attempted first degree murder for the shooting of Aldrema Scott. Specifically, the defendant alleges that under the "multiple persons" portion of the first-degree murder statute (La. R.S. 14:30 A(3)), as interpreted by our supreme court in State v. Andrews, 452 So.2d 687 (La.1984) and State v. Stewart, 458 So.2d 1289 (La.1984), the prosecution had to show the defendant, while shooting Aldrema Scott, simultaneously harbored specific intent to kill Angie Scott.
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La.Code Crim. P. art. 821B; State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988).
Under La. R.S. 14:30 A(3), first-degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person. An attempted offense is committed when a defendant, "having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object." La. R.S. 14:27 A. Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). To be guilty of attempted murder, a defendant must have the specific intent to kill and not merely the specific intent to inflict great bodily harm. Thus, a specific intent to kill is an essential element of the crime of attempted first degree murder. State v. Butler, 322 So.2d 189, 192 (La.1975). Specific intent to kill can be implied by the use of a deadly weapon such as a knife or a gun. See State v. Jordan, 276 So.2d 277, 279 (La.1973). Further, specific intent may be inferred from a defendant's actions and the *717 circumstances. State v. Broaden, 99-2124, p. 18 (La.2/21/01), 780 So.2d 349, 362, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001). Deliberately pointing and firing a deadly weapon at close range are circumstances that support a finding of specific intent to kill. Broaden, 99-2124 at 18, 780 So.2d at 362 (citing State v. Tassin, 536 So.2d 402, 411 (La.1988), cert. denied, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 159 (1989)). To be convicted of attempted first-degree murder under La. R.S. 14:30 A(3), therefore, the State must prove a defendant possessed the specific intent to kill more than one person and an overt act toward that goal.
In 1984, the supreme court in separate published opinions addressed the same legal issue regarding specific intent to kill under La. R.S. 14:30(3). See State v. Andrews, 452 So.2d 687 (La.1984); State v. Stewart, 458 So.2d 1289 (La.1984). In a plurality opinion, the Stewart court stated:
Consequently, this case presents the same legal question which was recently resolved by State v. Andrews, 452 So.2d 687 (La.1984): Under La. R.S. 14:30(3), which provides that first degree murder is "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm upon more than one person," is the state required to prove that the accused specifically intended by the same act to kill or greatly harm more than one person?
Stewart, 458 So.2d at 1291.
The court in Andrews answered in the affirmative. The plurality in Stewart, however, found La. R.S. 14:30(3) did not apply only to a single act when it stated that "La. R.S. 14:30(3) requires that the offender must actively desire that the death or great bodily harm of more than one person result from the act or acts by which he committed the homicide or by an act inseparable therefrom." Id.
The supreme court in State v. Williams, 480 So.2d 721, 726 (La.1985) elaborated on its holding in the Stewart decision:
The plurality opinion stated that "no rational trier of fact could have concluded beyond a reasonable doubt that [defendant], by firing at [victim] inside the house or by any other act inseparable from the killing of [victim], actively desired as a result to kill or inflict great bodily harm to more than one person." 458 So.2d at 1291. (Emphasis added) The plurality thus did not construe La. R.S. 14:30(3) to apply only to a situation involving a single act by which the defendant killed one person while having an active desire to kill others as a result of the act. While rejecting the theory that an intent to kill in a future and entirely separate criminal act would suffice to establish a "specific intent to kill... more than one person", the opinion stated that specific intent to kill through an "act inseparable" from the initial act of homicide would suffice. [Footnote omitted.]
In State v. Bourque, 622 So.2d 198 (La. 1993), overruled on other grounds, State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, where the defendant actually fired a deadly weapon at more than one person over a period of time, the supreme court distinguished Andrews and specifically rejected the idea that La. R.S. 14:30 A(3) must be interpreted solely as occurring by a single act:

Andrews is distinguishable from the present case. The defendant in Andrews, Reginald Andrews, went in search of two brothers with whom he had had a barroom fight earlier in the evening. Finding one brother, Andrews chased after him with a gun. The man escaped and no shots were fired. At another location, Andrews saw the other brother, whom he shot and killed.

*718 This court has rejected the idea that LSA-R.S. 14:30(A)(3), defining first degree murder as occurring when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person, must be interpreted solely as occurring by a defendant's single act, such as when a bomb explodes in a crowded building. Instead, this court has determined the legislature intended this type of first degree murder to include "those murderers who formed an intent to commit multiple killings and who did in fact create the risk of multiple deaths through a single act or a closely related series of acts that resulted in at least one death." State v. Williams, 480 So.2d 721, 727 (La.1985)(emphasis supplied); see also State v. Ward, 483 So.2d 578, 581-82 (La.1986), cert. denied, 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 168 (1986) (death penalty may be justified when a "single consecutive course of conduct" contemplates and causes the death of one person and great bodily harm to another).
Bourque, 622 So.2d at 230-31.
Since Bourque, the supreme court has reaffirmed its position regarding the application of La. R.S. 14:30 A(3) to situations involving a series of acts during a criminal episode rather than a single act. See Broaden, supra; State v. Baldwin, 96-1660 (La.12/12/97), 705 So.2d 1076, cert. denied, 525 U.S. 831, 119 S.Ct. 84, 142 L.Ed.2d 66 (1998). Thus, under the supreme court's interpretation of La. R.S. 14:30 A(3), a defendant need only form the requisite intent to kill multiple persons during a closely related series of acts. In the case at hand, the evidence, when viewed in a light most favorable to the prosecution, clearly supports the finding that the defendant possessed the specific intent to kill both Aldrema Scott and Angie Scott during a closely related series of acts.
The testimony elicited at trial established that the defendant, after being told to leave while standing at the front door, entered Aldrema Scott's home without permission, cursed at her, and shot her in the leg. When Aldrema tried to run away, the defendant shot her two more times in the chest. Immediately following the shooting, the defendant left Aldrema's house and came face to face with Angie Scott, who was coming toward her sister's house after having heard the gunshots. With no words exchanged and without provocation, the defendant shot Angie twice in her stomach.
Since specific intent need not be proven as a fact, but may be inferred from the defendant's actions and the circumstances of the transaction, it is reasonable that the jury concluded the defendant had specific intent to kill more than one person on the day he shot the Scott sisters moments apart in time. See Williams, supra. In the prosecutor's rebuttal closing argument, he argued the defendant's intent was to kill Aldrema Scott and any other witnesses that were out there.
In State v. Deboue, 552 So.2d 355 (La. 1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990), the defendant argued the evidence was not sufficient to establish that both victims were home at the time the first victim was murdered. He contended that if only one victim was in the apartment at the time of the first attack, or if both victims were there, but the defendant was not aware of the presence of both, then he could not have acted with specific intent to kill more than one person at the time he committed the first murder. Deboue, 552 So.2d at 360. Finding that all of the elements of La. R.S. 14:30 A(3) were satisfied and affirming the defendant's conviction and sentence, the supreme court stated:

*719 [T]here was sufficient evidence for the jury to find that defendant, upon breaking into the apartment, intended to kill anyone discovered therein so that there could be no witnesses against him. One of his stated reasons for killing the children was that he "did not want to do forty years." Therefore the jury could have reasonably concluded that the defendant acted throughout the course of the burglary with intent to kill one or more persons, i.e., any and all potential witnesses against him who were present at the scene. In order for the jury to make this determination, it was unnecessary for it to know with certainty which victim was attacked first, whether the defendant knew of the presence of both children in the home at the time that he committed the first murder, or whether the first victim was still alive at the time the second victim was attacked.
In summary, the evidence fully supports a finding that defendant committed both first degree murders.
Deboue, 552 So.2d at 360 (emphasis added).
Just as in Deboue, the jury in the present case could have reasonably concluded that the defendant acted throughout the course of entering and leaving Aldrema's home with the intent to kill one or more persons, i.e., any potential witnesses against him who were present at the scene. After a thorough review of the record, we are convinced that viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendant was guilty of the attempted first degree murder of Aldrema Scott and Angie Scott.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
In his second assignment of error, the defendant avers the trial court erred in failing to act on the defendant's timely filed motion to recuse and in continuing to act in the case after the motion was filed, making subsequent actions a nullity. Specifically, the defendant contends that pursuant to La.Code Crim. P. arts. 673 and 674, Judge Erwin did not have authority to continue presiding at trial until the motion to recuse was considered.
The defendant filed a pro se motion to recuse Judge Erwin on November 30, 2001. The pertinent sections of the motion that allege bias or prejudice are the following:

I.
Movant shows and contends that Judge Michael Erwin is biased, prejudice [sic] or personally interested in the cause titled and listed above to the extent that he is unable to conduct a fair and impartial trial.
....

IV.
Mover shows and contends that the Honorable Judge stated in open court "It's not going to do him any good" to get additional and/or "another counselor in this matter, so shut up and sit down."

V.
Mover contends that his rights to due process of law and counselor of choice has been and will be continually violated due to unfair conduct.
A defendant waives all pending motions by proceeding to trial without raising the issue that his pre-trial motions were neither heard nor ruled upon. State v. Wagster, 361 So.2d 849, 856 (La.1978). The record does not indicate that the trial *720 court ruled on the defendant's motion to recuse. Between the filing of the motion and the beginning of trial, the defendant appeared before the court no less than six times, and at no time during an appearance did the defendant raise the issue of his motion to recuse. The case proceeded to trial, and the defendant chose to be tried in absentia. The defendant was given ample opportunity to address the court regarding his motion to recuse, but failed to do so. As a result, the motion was waived.
The waiver issue notwithstanding, the defendant asserts that pursuant to La.Code Crim. P. arts. 673 and 674, Judge Erwin was obligated to either recuse himself or refer the motion to another judge for disposition based solely on the defendant's filing a motion to recuse. This assertion is erroneous. The mere filing of a motion to recuse does not compel a judge to act on that motion. Only when there is a valid ground for recusation in the motion is a judge obliged to act.
Louisiana Code of Criminal Procedure article 671 A provides that a judge in a criminal case shall be recused if he is "biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial." Further, Article 674 provides "If a valid ground for recusation is set forth in the motion, the judge shall either recuse himself, or refer the motion for hearing to another judge or to a judge ad hoc, as provided in Article 675."
Construing these articles, the supreme court in State v. Beavers, 394 So.2d 1218, 1229 (La.1981) stated:
Under the jurisprudence interpreting there (sic) articles, a motion for recusal must set forth allegations of fact which state a statutory cause for recusation before the trial judge is required to refer the motion to another judge. State v. Collins, 288 So.2d 602 (La.1974). Where, as here, the motion is based on mere conclusory allegations, the trial court does not err in refusing to refer the motion to another judge for hearing. State v. Maduell, 326 So.2d 820 (La. 1976).
The defendant's motion to recuse Judge Erwin did not satisfy the statutory provisions regarding the proper recusation of a judge. The defendant set forth no valid ground for recusation in his motion to recuse. He did no more than simply assert that the judge was biased or prejudiced or personally interested in the case without any support for the assertion. In the fourth paragraph of his motion to recuse, the defendant alleged a comment made by Judge Erwin that is found nowhere in the record. A motion to recuse a judge must be based on more than mere general conclusory allegations. State v. Lukefahr, 363 So.2d 661, 663 (La.1978), cert. denied, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). See also State v. Littleton, 395 So.2d 730, 732 (La.1981); State v. Gordy, 380 So.2d 1347, 1353 (La.1980).
The defendant's motion was not sufficient to warrant consideration and, as such, Judge Erwin was not obliged to hear the motion. Furthermore, on appeal, the defendant has failed to demonstrate prejudice or that any substantial rights were affected because of the trial court's failure to rule on his motion. La.Code Crim. P. art. 921; State v. Gaddis, 36-661, pp. 11-12 (La.App. 2 Cir. 3/14/03), 839 So.2d 1258, 1267, writ denied, XXXX-XXXX (La.5/14/04), 872 So.2d 519.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER THREE
In his third assignment of error, the defendant avers the trial court erred in *721 denying the motion to suppress the confession and in allowing this confession allegedly made by the defendant to be introduced at trial. Specifically, the defendant contends he did not knowingly and intelligently waive his rights before he confessed to Officer Hilton Riley. The defendant also argues that testimony elicited at the suppression hearings was inconsistent and that since he was under the influence of drugs when he confessed, his statement should have been suppressed.
Before a confession can be introduced into evidence, it must be affirmatively shown that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451. It must also be established that an accused who makes a confession during custodial interrogation was first advised of his Miranda rights. State v. Vigne, 2001-2940, p. 6 (La.6/12/02), 820 So.2d 533, 537. Since the general admissibility of a confession is a question for the trial court, its conclusions on the credibility and weight of the testimony are accorded great weight and will not be overturned unless they are not supported by the evidence. State v. Patterson, 572 So.2d 1144, 1150 (La.App. 1 Cir.1990), writ denied, 577 So.2d 11 (La. 1991). The trial court must consider the totality of the circumstances in determining whether a confession is admissible. State v. Hernandez, 432 So.2d 350, 352 (La.App. 1 Cir.1983). Testimony of the interviewing police officer alone may be sufficient to prove a defendant's statements were freely and voluntarily given. State v. Mackens, 35,350, p. 13 (La.App. 2 Cir. 12/28/01), 803 So.2d 454, 463, writ denied, XXXX-XXXX (La.1/24/03), 836 So.2d 37.
When a confession is challenged on the ground that it was not freely and voluntarily given because the defendant was intoxicated at the time of the confession, the confession will be inadmissible only when the intoxication is of such a degree as to negate the defendant's comprehension and to make him unconscious of the consequences of what he is saying. Whether intoxication exists and is sufficient to vitiate the voluntariness of a confession are questions of fact, and the ruling of the trial court on this issue will not be disturbed unless unsupported by the evidence. State v. Williams, 602 So.2d 318, 319 (La.App. 1 Cir.), writ denied, 605 So.2d 1125 (La.1992).
At the first suppression hearing, Officer Hilton Riley, the arresting officer, was the only person to testify. The testimony elicited established that Officer Riley, upon arresting the defendant, orally advised him of his Miranda rights at the scene of the arrest. The defendant was then transported to the First District Sheriff's Department where he was again advised of his rights. At the police station, the defendant told Officer Riley that on the day of the shooting he was on drugs, that he thought Aldrema Scott was having a relationship with another man, and that he went to their home and began firing off shots point blank at Aldrema Scott. Officer Riley testified that he had no problem talking with or discussing anything with the defendant, and that the defendant appeared to understand everything that he was saying. He testified the defendant signed a written waiver of rights form after having been read his rights, and that he seemed to understand everything read to him. He testified that he did not threaten or promise the defendant anything in exchange for making any statement, and he did not observe anyone else threaten or promise or give the defendant any inducements into making any statements. At the end of the hearing, the trial court found the statement was freely and *722 voluntarily given and denied the motion to suppress.
This court reversed the trial court's denial of the motion to suppress, finding that the court abused its discretion in ruling the defendant could not cross-examine Officer Riley about his relationship with the defendant. State v. Maten XXXX-XXXX (La. App. 1 Cir. 7/01/02) (unpublished writ action). The motion to suppress was continued and reopened for further testimony.
At the reopened suppression hearing, the defendant testified that Officer Riley did not read him his rights. The defendant testified that he never signed the written waiver of rights form and that he never gave Officer Riley any statement about shooting Aldrema Scott. On cross-examination, however, the defendant admitted that the signature on the waiver of rights form was almost identical to his signature. Further during cross-examination, the defendant, while claiming to be high on drugs at the time of his arrest, remembered many details of his arrest. The defendant remembered that he signed for his personal belongings, but claimed he could not remember whether he signed the waiver of rights form. The defendant also testified that Officer Riley did not threaten, promise, or coerce him in any way into making any type of statement. At the conclusion of this hearing, the trial court again found the statement by the defendant was given freely and voluntarily and, as such, would be admissible during trial.
While at the first suppression hearing, Officer Riley testified that the defendant confessed to him at the police station; at trial, Officer Riley testified that the defendant confessed to him at the scene of the arrest as well as at the police station. The defendant argues in his brief that this alleged inconsistent testimony undermines Officer Riley's credibility, thereby raising doubt as to the voluntariness of the oral statement.
We do not find Officer Riley's testimony to be inconsistent. At trial, Officer Riley was asked questions that required him to elaborate on the confession made by the defendant prior to arriving at the police station. At the first suppression hearing, Officer Riley was only asked questions that required him to elaborate on the defendant's confession made at the police station. At this first hearing, defense counsel had the opportunity to ask Officer Riley specific details about the confession at the arrest scene, but glossed over this area and, instead, focused his questions on why the defendant's police station confession was not recorded:
Q. And you told Mr. Maten what he was being arrested for?
A. When I read him his rights.
Q. At the scene?
A. At the scene?
Q. Yes, sir.
A. Yeah.
Q. And you read him his rights at the scene?
A. At the scene.
Q. And you read him his rights at the police station?
A. Yes, I did.
Q. And that's when he signed that?
A. Yes.
Q. And isn't it in your policies and procedures manual to get written statements or taped statements when you can, as opposed to oral, verbal statements?
At the reopened suppression hearing, defense counsel, again with the opportunity to inquire about the conversation Officer Riley had with the defendant at the arrest scene, neglected to do so:
Q. So did you arrest him?

*723 A. Sergeant Cornelius and myself arrested him.
Q. When did Sergeant Cornelius come back?
A. He came back like maybe twenty minutes later.
Q. So for twenty minutes you just hung around with Toby?
A. Yes, we was (sic) outside standing up talking.
. . . .
Q. You're saying that Sergeant Cornelius came up after twenty minutes and arrested Mr. Maten?
A. Well, I arrested him and placed him in my unit.
Q. You arrested him. Did you read him his rights?
A. Yes.
Q. And did you take him back to the Plank Road police station?
A. Yes.
Thus, at trial, when defense counsel asked Officer Riley why he did not testify at the reopened suppression hearing about the defendant's confession in both locations, Officer Riley informed him it was because he never asked:
Q. Day before yesterday, did you testify?
A. Correct.
Q. Did you testify that Toby Maten gave you a confession at the police station, as well as on the scene?
A. No, I didn't.
Q. Why not?
A. First of all, I wasn't asked that question, was I.
Q. Honestly, I don't remember whether you were or not, I think that  well, I'm not going to make a speech on it....
If there was any confusion regarding Officer Riley's testimony at both suppression hearings and at trial, we find it is not because his testimony was inconsistent, but because pertinent testimony was not elicited.
We next address the issue of the voluntariness of the defendant's confessions. At trial, Officer Riley testified on direct examination as follows:
Q. What happened when you came into contact with Mr. Maten?
A. We started verbalizing. I read him his rights, first of all, I read him his rights.
Q. And what rights did you advise him of?
A. Well, it goes like, you know: You have the right to remain silent. Anything you say can be used against you in a court of law. You have a right to an attorney. If you cannot afford one, one would be appointed to you prior to questioning. And I asked him did he understand his rights and he said yes sir. And after we finished, after I'd finished giving him his rights, I asked him, you know, what happened. He told me the day of the shooting that he was drinking and had some drugs and, you know, that his girlfriend had been cheating on him. And that when he went to the house he shot her point-blank.
Q. Then after he gave you that statement, what did you do?
A. After he gave me that statement, my training officer came, Officer, ah, Corporal then, but Sergeant Cornelius came up. And he asked Toby to get in the car, you know, that they had an arrest on him, arrest warrant on him, and that he should come with us. And I handcuffed him, double locked him, handcuffed him and placed him in the unit and we proceeded to the First District, to begin processing.
*724 Arguably, when the defendant first confessed, he was not in custody since, at that point, he had not been arrested, handcuffed, or placed in the patrol unit. As such, there could have been no custodial interrogation, and Miranda would be inapplicable. On the other hand, if the defendant was deprived of his freedom of action in any significant way when Officer Riley asked him what happened, then such questioning would constitute custodial interrogation, and Miranda warnings would be required. See State v. Robinson, 384 So.2d 332, 335 (La.1980).
Testimony at trial established that when the defendant was brought to the police station, Officer Riley informed the defendant of his rights a second time, by way of a waiver of rights form. After this, Officer Riley asked the defendant again what happened, and he confessed the same thing, that he had gone to his girlfriend's house and shot her. Since the defendant's confession at the arrest scene, under either analysis, and his confession at the police station would be admissible because they were clearly free and voluntary and the defendant was advised of his Miranda rights, the issue becomes one of credibility.
The trial court believed the defendant gave a statement to Officer Riley, the defendant made a knowing and intelligent waiver of his constitutional rights, and the defendant lied about it not being his signature on the waiver of rights form. The admissibility of a confession is a question for the trial court, whose conclusions on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility should not be overturned on appeal unless they are not supported by the evidence. State v. Jackson, 381 So.2d 485, 487 (La.1980). We find the trial court's conclusions are supported by the evidence and, thus, will not be overturned.[2]See State v. Patterson, 572 So.2d 1144, 1150 (La.App. 1 Cir. 1990), writ denied, 577 So.2d 11 (La.1991).
We further find that even had the defendant's confessions been improperly admitted, such an admission would be harmless error. Louisiana Code of Criminal Procedure article 921 states "[a] judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused." Our supreme court has adopted the federal test refined in Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) in determining whether harmless error has occurred. State v. Maise, XXXX-XXXX, p. 9 (La.1/15/02), 805 So.2d 1141, 1148. The pertinent inquiry to determine if a trial error is harmless is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in a trial was surely unattributable to the error. Maise, XXXX-XXXX at 8-9, 805 So.2d at 1148. "If, when all is said and done, the conviction [sic] is sure that the error did not influence the jury, or had but very slight effect, the verdict and judgment should stand. . . ." Kotteakos v. U.S., 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1566 (1946).
We are convinced that, after a thorough review of the entire record, the confessions by the defendant of the shootings to Officer Riley had little, if any, effect on the jury's verdicts. The three people who positively *725 identified the defendant at the crime scene were a neighbor of the victims and the two victims whom the defendant shot at point-blank range. There can be no doubt that the victims, the defendant's girlfriend and her sister, who knew the defendant for years, knew who they were identifying at trial when they pointed out the defendant as the shooter. Notwithstanding any confession to the crimes, the direct evidence clearly establishes the defendant's guilt.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER FOUR
In his fourth assignment of error, the defendant avers "[t]he record fails to establish that the defendant had the right to remain silent and the right to a hearing on the multiple offender bill of information before accepting a stipulation as to habitual offender status."
When a trial court fails to advise a defendant of his right to a formal hearing and right to remain silent, the habitual offender adjudication and sentence must be vacated. State v. Gonsoulin, 2003-2473, p. 3 (La.App. 1 Cir. 6/25/04), 886 So.2d 499, 501, writ denied, XXXX-XXXX (La.12/10/04), 888 So.2d 835. At the habitual offender hearing on January 22, 2004, the defendant stipulated to being a second felony offender as to count I of his conviction. While the court minutes show the defendant, through counsel, informed the court he wished to waive his right to a habitual offender hearing and wished to stipulate as to said violation, they do not indicate he was advised of his right to remain silent. However, the transcript of the habitual offender hearing shows that the trial court advised the defendant of his right to remain silent and his right to a formal hearing, and that the defendant understood and waived these rights when he stipulated to being a second felony offender. In the event of a discrepancy between the minutes of a hearing and the transcript, the transcript prevails. State v. Watson, XXXX-XXXX, p. 3 n. 4 (La.5/14/02), 817 So.2d 81, 83 n. 4.
This assignment of error is without merit.
CONVICTIONS AND SENTENCES AFFIRMED.
CARTER, J., dissents with reasons.
CARTER, C.J., dissenting.
Although the record clearly supports the defendant's conviction for attempted first degree murder, the record also clearly reflects that the defendant filed a motion to recuse the trial judge. I am of the opinion that once the motion to recuse was filed, the trial judge had no power or authority to take further action in this matter.[1]See LSA-C.Cr.P. art. 673; State v. Price, 274 So.2d 194, 197 (La.1973); Kidd v. Caldwell, 371 So.2d 247, 251-252 (La.1979). Therefore, I respectfully dissent.
NOTES
[1] The trial court denied the motion to suppress. This court reversed that ruling because the trial court abused its discretion in ruling that the defendant could not cross-examine the arresting officer about his relationship with the defendant. State v. Maten, XXXX-XXXX (La.App. 1 Cir. 7/01/02) (unpublished writ action).
[2] In determining whether the ruling on defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. State v. Chopin, 372 So.2d 1222, 1223 n. 2 (La.1979).
[1] Exceptions to this general principle include the power to refer the motion to another judge for consideration, and the inherent power to control the conduct of those in the courtroom while court is in session. See State v. Price, 274 So.2d 194, 197 (La.1973); Kidd v. Caldwell, 371 So.2d 247, 253 (La.1979).